**ASSED KALIL, STEPHEN PONSLER,**

**Plaintiffs,**

**-vs-**                                                            **Case No.  6:08-cv-2192-Orl-28KRS**

**BLUE HERON BEACH RESORT
DEVELOPER, LLC, PREMIER REAL
ESTATE OF DESTIN, INC., F.W.
"FREDDIE" SCHINZ, and VINCENT A.
BILELLO,**

**Defendants.**

_____

# ORDER

Defendants liken this case "to a kindergarten game of musical chairs." (Doc. 69 at 21). Plaintiffs, on the other hand, characterize it as "the old game show *To Tell The Truth*," with the caveat that "unlike the contestants on *To Tell The Truth*, Plaintiffs did not know they were being misled." (Doc. 78 at 19). Having reviewed the record evidence and the parties' arguments on summary judgment, the Court agrees with Defendants' characterization—Plaintiffs lost at the condominium-flipping game when they were left without a metaphorical chair when the music stopped and the real estate market collapsed, and Defendants did not mislead them as to any material issue in the playing of that game.

## I.  Background

This case arises from the purchase by Plaintiffs, Assed Kalil and Stephen Ponsler, of a three-bedroom, sixteenth-floor penthouse condominium at a new development in

Orlando, Florida. Hoping to "flip" the condominium for a profit, Plaintiffs signed a purchase agreement in September 2005—before construction was complete—and closed on the unit in May 2006. They now seek rescission of the transaction—or alternatively, damages of more than $1 million—contending that the developer, Defendant Blue Heron Beach Resort Developer, LLC ("Blue Heron"), and other Defendants defrauded them in connection with the purchase.

Plaintiffs are residents of the state of Indiana. Sometime during the summer of 2005, Jackie Lindsay, an Orlando realtor, visited a friend—Plaintiff Kalil's mother—in Indiana. (Kalil Dep., Attach. to Doc. 68, at 26-28). During that visit, Kalil asked Lindsay to let him know if she found any good real estate investment deals in Florida, (id. at 27-28); Kalil and co-Plaintiff Ponsler regarded Florida as an attractive market for real estate investment at the time, (Ponsler Dep., Attach. to Doc. 69, at 10). Sometime after Lindsay returned to Florida, she called Kalil and asked him if he was interested in a "fairly quick opportunity" to acquire a condominium unit at Blue Heron's development. (Kalil Dep. at 27). Lindsay had spoken to someone at Defendant Premier Real Estate of Destin, Inc. ("Premier")—a sales agency that Blue Heron had engaged to sell the units—about the development, and Lindsay relayed to Kalil that there was one last three-bedroom unit available, that the project would be completed in six to nine months, and that there was an opportunity to make money on it. (Id. at 29).

Kalil was interested in this prospect, and thereafter he spoke with Cynterra Lezotte of Premier on the telephone between five and ten times regarding the unit. (Id. at 20). At first, Lezotte indicated that the price of the unit was $885,000, but she then told Kalil that she

could sell it to him for $850,000 and that that was "the best she could get from the developer." (Id. at 44). There were no back-and-forth negotiations; Kalil merely asked Lezotte what the best price was that he could get on the unit, and she responded with the $850,000 figure. (Id. at 44-46). Lezotte told Kalil that once the project was completed, buyers would be willing to pay 1.2 million dollars for the unit. (Id. at 21).

Kalil asked Lindsay if she thought that Lezotte's estimated resale amount of $1.2 million seemed reasonable to her, and Lindsay told Kalil that it did, explaining the state of the Orlando real estate market to him. (Id. at 42-43). Lindsay thought that $850,000 was a good price and that Kalil would be able to resell the unit for $1.2 million. (Id. at 55).

On September 2, 2005, without visiting the Orlando sales office, Kalil and Ponsler executed a Subscription and Purchase Agreement ("SPA") for Unit 1-1602 at the Blue Heron development for a price of $850,000, paying a twenty-percent deposit—$170,000. Although Plaintiffs had hoped to "flip" the condominium before closing and make a profit on it, they were unable to resell the unit and they closed on it on May 11, 2006.

More than two years later, in October 2008, Plaintiffs learned that before they had entered into their SPA, Blue Heron had contracted with Defendant Vincent Bilello for the sale of the same unit.[1] Indeed, Bilello had signed a SPA on March 8, 2004, agreeing to purchase

---

[1]Defendants assert that there is a factual dispute as to whether Plaintiffs knew of Bilello's contract at the time Plaintiffs signed their SPA in September 2005. (See Doc. 69 at 16). However, the Court has been directed to no evidence supporting knowledge by Plaintiffs of Bilello as of that date, and in any event the Court must construe the facts in favor of Plaintiffs as the nonmovants in ruling on this motion.

According to Plaintiffs, Bilello's affiliation with the unit was discovered in the fall of 2008 by their attorney in Indiana who noticed a line on the closing statement referring to Bilello and "assignment proceeds." The attorney made inquiry of Blue Heron regarding

Unit 1-1602 for a price of $435,525 and paying a deposit of $87,105.  (Bilello SPA, Ex. 8 to Doc. 78).  Bilello then asked Premier to try to find a buyer for the unit before he closed on it; Premier, through Lezotte, found such buyers in Plaintiffs.  Then, on September 20, 2005—three weeks after Plaintiffs signed their SPA for Unit 1-1602—Bilello and Blue Heron executed a "Cancellation Agreement" terminating Bilello's SPA, and Bilello's deposit was returned to him.  (Cancellation Agreement, Ex. 9 to Doc. 78).

Blue Heron agreed to allow Bilello to receive the difference between his contract price and the price that Plaintiffs paid when and if they closed; this agreement is documented in a "Unit Resale Record" signed by Bilello on December 9, 2005 and by Blue Heron on January 9, 2006.  (Unit Resale Record, Ex. 10 to Doc. 78).  That document states that Bilello

─────────────────────

Bilello, and Blue Heron, through its attorney, responded with a letter that stated in part:

> The unit was contracted to Vincent A. Bilello in March 2004, for $435,525.  Thereafter, Mr. Bilello listed the unit with Premier Real Estate of Destin, Inc. and the unit was resold to your client.  Upon being presented with the new sales agreement and request to terminate Mr. Bilello's existing sales agreement, my client simply honored the request.
> As detailed by the settlement statement signed by your clients at closing, the proceeds received by my client were based on the original sales price and all amounts in excess of that price were paid to Mr. Bilello or his sales agents as commission.
> My client did not list the unit for resale, did not authorize either Mr. Bilello or Premier Real Estate of Destin, Inc. to make any representations on its behalf nor did my client profit from the resale of the unit to your client.  My client simply honored the request of Mr. Bilello and his broker to terminate the first sales agreement after being presented with your clients' sales agreement and a request for such termination.

(Letter dated Oct. 24, 2008 from Burke to Scimia, Ex. 11 to Doc. 78).

would receive net profit of $380,896 "at time of unit closing by new Buyer upon completion of Tower I." (Id.). The document also gave Bilello the option to buy the unit at his original price in the event that Plaintiffs failed to close on the unit. (Id.). The closing statement from Plaintiffs' May 11, 2006 closing includes a line indicating "Assignment Proceeds . . . to Vincent Bilello" in the amount of $378,824—$380,896 less $2072 in costs paid by Bilello. (HUD-1 Settlement Statement, Ex. 16 to Doc. 78, at 2). Thus, as agreed between Bilello and Blue Heron, when Plaintiffs closed on the unit Bilello received essentially the full difference between the price he had contracted to pay more than two years earlier and the price that Plaintiffs paid for the unit; Blue Heron received the same amount from the sale of the unit as it would have received if Bilello had closed pursuant to his SPA.

On December 31, 2008, two months after learning of Bilello's involvement with the unit, Plaintiffs filed this lawsuit against Blue Heron, Premier, Bilello, and F.W. "Freddie" Schinz, the managing member of Blue Heron. Plaintiffs contend that instead of "directly" buying the unit from the developer at a "preconstruction price" as they had believed they were doing, they actually purchased a "resale" unit from Bilello. They assert that they would not have entered into the SPA or closed on the purchase if they had known of Bilello's prior contract, and they seek rescission of the transaction.

In the Amended Complaint (Doc. 47), Plaintiffs set forth three claims: violation of the Interstate Land Sales Full Disclosure Act ("ILSFDA"), 15 U.S.C. § 1701 et seq., by all Defendants (Count I); fraudulent inducement under Florida law against Bilello, Blue Heron, and Premier only (Count II); and fraudulent concealment under Florida law against all Defendants (Count III). The claims against Premier have been settled. (See Docs. 86 & 95).

Defendant Bilello, appearing pro se, filed a motion to dismiss early in the case; since the denial of that motion, Bilello has made no further filings in this Court, though he apparently did participate in mediation. The case is currently before the Court on the motion for summary judgment (Doc. 69) filed by Defendants Blue Heron and Schinz only.

II. Discussion

A. Summary Judgment Standards

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The moving party bears the burden of establishing that no genuine issues of material fact remain. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). However, summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

"'In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the

mere hope that something will turn up at trial.'  Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'"  Sawyer v. Sw. Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988), and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).

B.  The Merits of Defendants' Motion

Blue Heron and Schinz seek summary judgment on all three counts of the Amended Complaint.  The counts are addressed separately, beginning with the state law claims.

1.  Fraudulent Inducement (Count II)

In Count II, Plaintiffs allege—against Blue Heron, Premier, and Bilello only—a claim of fraudulent inducement under Florida law.  "The essential elements to establish a claim for fraudulent inducement are:  (1) a false statement of material fact; (2) the maker of the false statement knew or should have known of the falsity of the statement; (3) the maker intended that the false statement induce another's reliance; and (4) the other party justifiably relied on the false statement to its detriment."  Rose v. ADT Sec. Servs., Inc., 989 So. 2d 1244, 1247 (Fla. 1st DCA 2008); accord Johnson v. Davis, 480 So. 2d 625, 627 (Fla. 1986).  Plaintiffs set forth several alleged misrepresentations in the fraudulent inducement claim in Count II.  However, the record evidence reveals that none of these statements was false, and therefore this claim fails.

a. Direct Purchase from the Developer

First, Plaintiffs allege that—both in Lezotte's representations and in the SPA—they were told that Blue Heron was selling the unit and that their purchase would be directly from

Blue Heron as the developer. (Am. Compl. ¶¶ 41-43; see also Joint Final Pretrial Statement, Doc. 91, at 2). Though they argue that these statements were false, Plaintiffs did in fact purchase the Unit "directly" from Blue Heron. Their SPA was with Blue Heron, and the property was deeded to them from Blue Heron. The fact that Bilello at one time had a contract to purchase the same unit[2] does not alter these facts; Blue Heron sold the unit to Plaintiffs. This statement therefore does not support a claim of fraudulent inducement.

*b. Preconstruction Price*

Second, Plaintiffs assert that they were repeatedly told that the unit was being sold "at preconstruction pricing" and that this statement was false. (Am. Compl. ¶¶ 41-42, 44). This assertion is based on Plaintiff's attribution of a particularized, specific meaning to the term "preconstruction price."

Kalil testified in his deposition that this term "means you're buying from the developer before you've had somebody else own it. So it's not a resale." (Kalil Dep. at 14). Kalil described this as "[his] interpretation of it. That's all. . . . [I]t's just something that [he]

_____

[2]Plaintiffs assert—albeit only in connection with trying to establish personal liability of Schinz—that a statement in a "Seller's Affidavit" executed by Schinz just prior to closing is false. This affidavit states in part: "Affiant has entered into no agreement, contract, or commitment for the sale, lease, mortgage, option or other encumbrance of said property." (Ex. 15 to Doc. 78). Although Plaintiffs suggest that this statement was untrue because of Bilello's prior contract on the unit, this document was executed in connection with the issuance of title insurance and for the purpose of establishing that Blue Heron had good title to the unit to convey to Plaintiffs. (See id.; see also Schinz Dep., Ex. 6 to Doc. 78, at 93). The fact that Bilello previously had a contract to purchase the unit does not render this statement false, as it plainly referred to the state of title at the time of closing. Bilello's prior contract—cancelled eight months earlier—did not affect or encumber the property as of the May 2006 closing. Thus, to the extent Plaintiffs may be attempting to argue that this affidavit amounts to a false misrepresentation, that contention is rejected.

understood." (Id.).  However, Kalil then conceded that if the developer had already built the unit and it had not been sold, that would not be "preconstruction"; he modified his interpretation to be "before the development is done which is why it's classified as preconstruction.  So before the date of completion."  (Id. at 14-15).  His definition of "preconstruction prices" is "what a developer selling directly to [him] would sell it for before construction was completed."  (Id. at 15).

Ponsler also testified in his deposition as to his opinion of the definition of "preconstruction pricing," opining that it means that the price "was a discount to the market" or "below market value."  (Ponsler Dep. at 6-7, 57-58).  This "discount to the market" definition was "just . . . [Ponsler's] limited knowledge of the real estate market," and he is "not an expert in the real estate market."  (Id. at 7, 58).  However, like Kalil, Ponsler also testified that "[i]t was preconstruction because the units were not finished," (id. at 25), though he later disagreed that "preconstruction" means "a unit that you contract to purchase before the unit is fully constructed," (id. at 57-58).

Although Plaintiffs have put forth their own opinions of the meaning of "preconstruction price," their opinions do not establish the definition or that what they were told as to the nature of the price was false.  At the time Plaintiffs signed their SPA, the condominium was, as known to Plaintiffs, not completed.  (Kalil Dep. at 15; Ponsler Dep. at 58).  Thus, while Plaintiffs contend that the price was not in fact a "preconstruction price," the unit was in the preconstruction stage when Plaintiffs entered into the SPA, and the Court declines to ascribe a particularized meaning to this term absent evidence supporting such

a meaning.[3]

Plaintiffs also attempt to rely on the deposition testimony of Premier's president, E.L. "Butch" Matthews, to establish that the price they paid was not a "preconstruction price" or that they were otherwise misled as to price. However, these assertions also ring hollow. Matthews explained the general practices of Premier at Blue Heron. Some buyers of units at the Blue Heron development were offered "developer credits" that resulted in a discounted price. (Matthews Dep., Ex. 3 to Doc. 78, at 37). There was no set arrangement regarding any percentage of discount given; some buyers received a four or even fourteen percent discount, but some buyers were given no discount at all. (Id. at 38). When buyers began wanting to flip their units prior to closing, Premier would handle such "resales" if the buyer wished, and Premier kept separate price sheets regarding "developer new units" and "resale units." (Id. at 41-44). The "resale units" on these sheets were priced higher than the "developer units," and buyers were sometimes shown these price sheets. (Id. at 44). The pricing on these "developer units" and "resale units" was "completely different," the units were handled differently by Premier; the two types of units did not generate the same commissions for Premier; and Premier "wanted . . . people to know what units were developer units and what units were resale units." (Id. at 45-46).

―――――――――――――――

[3]Moreover, one of the definitions provided by Kalil—"what a developer selling directly to [him] would sell it for before construction was completed," (Kalil Dep. at 15), is satisfied by what occurred here. Plaintiffs were offered—and accepted as reasonable—a price of $850,000 for a unit that was not completed, and that is the price they paid in a transaction in which they acquired title directly from the developer. Thus, even under Kalil's own definition of "preconstruction pricing," the price they contracted for was a preconstruction price.

Plaintiffs attempt to use this testimony to show that there was a difference between "resale units" and "developer units" and that they did not in fact receive a unit directly from the developer at a "developer price." The problem with this contention is that there is no evidence that the price sheets or different characterizations of units by Premier had anything at all to do with Plaintiffs' buying experience. Plaintiffs do not allege that they were shown these price sheets or were aware of separate price lists at any time prior to the transaction at issue. Instead, Kalil believed—based largely if not entirely on reading generalized "major newspaper articles" in newspapers such as *USA Today*—that "entering into a contract with a developer preconstruction you're paying a lower price for the unit." (Kalil Dep. at 16-19). Kalil did not attempt to negotiate with Lezotte about price; he merely accepted the price that Lezotte quoted him. Plaintiffs do not have an entitlement to be shown price lists, nor, subject to certain exceptions not applicable here,[4] do they have any "right" to be offered the same price as any other buyer. The representations that actually were made to Plaintiffs are what is germane to their case, and deposition testimony as to practices of which Plaintiffs were not aware does not establish that Plaintiffs did not receive what they were told they would receive.[5]

———————————————

[4]Of course, there are fair housing laws prohibiting discrimination based on race and other protected characteristics, but no violation of any such laws has been asserted in this case.

[5]Additionally, Plaintiffs place far too much stock in terminology. From "developer unit" to "preconstruction price" to "resale," they repeatedly rely on semantics to attempt to support their claims. However, in the end they have not established that they did not get what they were told they were getting: a condominium deeded to them directly from the developer at a price they were willing to accept during construction of the project—the preconstruction phase. Even if Blue Heron or Premier referred to units as "resales" if the original purchasers

*c. Resale Estimate of $1.2 Million*

Third, Plaintiffs allege that Lezotte fraudulently represented that "the estimated resale value for Plaintiffs would be $1.2 million." (Am. Compl. ¶¶ 41-42). This statement, even as alleged by Plaintiffs, is Lezotte's estimate of what price Plaintiffs could possibly get upon resale of the unit at a later time based on the market as it existed at the time of execution of the SPA. Plaintiffs acknowledge that they were not guaranteed this return (Kalil Dep. at 21; Ponsler Dep. at 27), nor, or course, could they be; their return was, as was known to them, going to be dependent on market conditions. Moreover, Kalil asked Lindsay, a family friend, if Lezotte's estimate was reasonable given the market conditions in Orlando, and Lindsay told him that it was. This statement is not actionable as a false statement; at most, it is a statement of market potential that has not been shown to have been inaccurate at the time it was made. Cf. Boatwright v. Carney Realty, Inc., Civ. Action No. 08-0660-WS-B, 2009 WL 3615048, at *15 (S.D. Ala. Oct. 29, 2009) (rejecting condominium flippers' fraud claim that was based on statement regarding $100,000 price increase for resale).

Moreover, the written contract that Plaintiffs signed—the SPA, which Kalil admits he did not even read before signing—contained a provision stating, on the first page and in large, bold, allcaps print: "Oral representations cannot be relied upon as correctly stating the representations of the developer. For correct representations reference should be made to this contract . . . ." (SPA, Ex. 7 to Doc. 78, at 1 (font enhancements removed)). Plaintiffs

_____

were allowed to cancel their contracts, the units involved in these transactions—including the unit that Plaintiffs purchased—were only sold once. Labeling for an accounting or other purpose by the seller has not been shown to have affected the character of Plaintiffs' transaction in any legally significant way.

were not justified in relying on Lezotte's estimation. They knew that resale would be dependent upon market forces, and an oral statement by Lezotte as to resale potential does not support their fraud claim.

*d. Conclusion as to Count II*

In sum, none of the alleged false statements has been shown to in fact have been false.[6] Therefore, Blue Heron is entitled to summary judgment on Count II of the Amended Complaint.

## 2. Fraudulent Concealment (Count III)

In Count III, Plaintiffs bring a claim of fraudulent concealment against all of the Defendants. To prevail on this count, Plaintiffs must show that Defendants knew of a fact materially affecting the value of the property but did not disclose that fact. See Johnson v. Davis, 480 So. 2d 625, 629 (Fla. 1985); accord Billian v. Mobil Corp., 710 So. 2d 984 (Fla. 4th DCA 1998).

Plaintiffs assert in Count III that the "Defendants concealed from, and failed to disclose to, Plaintiffs that Bilello possessed an interest in and had a contract to buy the Unit, that Premier Real Estate was acting as the agent for both Blue Heron LLC and Bilello in the marketing and sale of the Unit and in the Transaction, that the Transaction was not truly a direct sale by Blue Heron LLC to Plaintiffs at a preconstruction price, or that Schinz and Blue

---

[6]In the Amended Complaint, Plaintiffs also alleged that Lezotte told them that "there was already strong interest in the Unit for sale after completion of construction" and that Blue Heron "had a very limited supply of units for sale at the Resort." (Am. Compl. ¶ 41). However, these statements have not been argued by the parties in their motion papers, nor are they mentioned in the Joint Final Pretrial Statement (Doc. 91). No evidence has been presented that either of these statements was false.

Heron LLC had agreed to allow Bilello to terminate his purchase contract so the Unit could be sold to Plaintiffs." (Am. Compl. ¶ 48). Plaintiffs contend that each of these facts was material to the transaction and that they would not have made the purchase if they had been told these items. However, as set forth below, none of these facts has been shown to be material.[7]

    *a. "That Bilello possessed an interest in and had a contract to buy the Unit"*

Plaintiffs assert that they would not have entered into the SPA if they had known that at that time Bilello "possessed an interest in" and had a contract to buy the condominium unit. However, they have not explained or presented evidence of how Bilello's prior contract is a fact material to the purchase.

Plaintiffs' bald contention that they would not have entered into the SPA if they had known of Bilello's previous agreement is not sufficient to establish materiality of the Bilello agreement. One "aspect of materiality is that the concealed fact 'must affect the value of the property or cause loss to the purchaser.'" Casey v. Cohan, 740 So. 2d 59, 62 (Fla. 4th DCA 1999) (quoting Pryor v. Oak Ridge Dev. Corp., 119 So. 326, 329 (Fla. 1928)); accord Billian,

---

[7]Plaintiffs allege in a footnote in their response to Schinz and Blue Heron's summary judgment motion that "Defendants do not claim that the facts not disclosed to Plaintiffs were immaterial." (Doc. 78 at 14 n.6). This footnote appears in a discussion of whether Schinz can be held personally liable in this case, and it is not clear whether Plaintiffs are taking the position that Defendants are not alleging immateriality overall. If Plaintiffs are making such an argument, it is rejected. Materiality was the clear focus of the summary judgment motion (Doc. 68) filed by Premier before it reached a settlement with Plaintiffs, and the alleged liability of Schinz and Blue Heron is based largely on the actions of Premier. Moreover, Schinz and Blue Heron do address the matter of whether Bilello's interest affected the value of the property, (see, e.g., Doc. 69 at 21), though they also take the position that Bilello's interest was disclosed on the HUD-1 statement, (see id. at 16). Materiality is at the heart of this case, and the parties clearly are aware of this.

710 So. 2d at 987 ("[T]he materiality of a fact is to be determined objectively by focusing on the relationship between the undisclosed fact and the value of the property. To be actionable, an undisclosed fact must materially affect the value of the property.").

In Casey, the Fourth District Court of Appeal affirmed the trial court's determination that the existence of a "secret agreement" between a seller of stock and one of its purchasers did not affect the value of the stock purchased by the appellant, and thus the discovery of that agreement several years later—after the stock had become valueless—did not entitle the appellant to rescind the stock purchase. "[T]he value of the stock sold was not impacted in any way by the failure to disclose the secret agreement," and there was no causal relationship between the nondisclosure and the events that later rendered the stock valueless. 740 So. 2d at 63.

Similarly, in Pryor, on which the Casey court relied, a commission agreement connected to a sale of real estate had not been disclosed to the purchasing corporation. The corporation later sought to rescind the transaction, but the Supreme Court of Florida found that the commission agreement "was not material because it did not affect the value of the land purchased." Id. at 63 (discussing Pryor). "There was no allegation that the buyers had been deceived 'as to any existing fact regarding the location, condition, or title to the lands which would in any wise affect its value,' nor was there any contention that 'the price at which the land was purchased was excessive, or not a fair price at the time and place of the purchase and sale.'" Id. (quoting Pryor, 119 So. at 328-29).

The instant case is analogous to Casey and Pryor. Plaintiffs were not deceived as to the location, condition, or title to the condominium that they purchased. Although they

continue to assert that they bought the condominium from Bilello and that Bilello had an "interest" in the condominium, they in fact took title directly from Blue Heron, which had cancelled its contract with Bilello nearly eight months prior to Plaintiffs' closing. Additionally, Plaintiffs believed that the price they were paying was fair and reasonable, and it has not been shown to have been otherwise. Plaintiffs' lender had the property appraised in February 2006, and that appraisal—as known to Plaintiffs at that time—valued the unit at $812,000,[8] within 4.5% of the price Plaintiffs agreed to pay in September 2005 and ultimately paid in May 2006. Plaintiffs also had looked at other "preconstruction" units at other developments prior to signing the SPA, and the prices of those other units were comparable. (Ponsler Dep. at 8, 48). And, of course, Kalil had confirmed the reasonableness of the $850,000 price with his family friend and realtor, Lindsay, prior to signing the SPA.

Plaintiffs assert that where "someone has purchased it at preconstruction price and has already sold it to another individual, it would be less likely that individual could sell it to make money." (Id. at 47). In essence, Plaintiffs opine that where a property has already been "flipped" once, the potential for a profitable second flip is extinguished or lessened. However, Plaintiffs have presented absolutely no evidence to support this contention, and indeed it flies in the face of the reality of the Florida real estate market as it existed just a few years ago. Many condominiums were flipped multiple times prior to anyone ever closing on

_____

[8]Plaintiffs object to the Court's consideration of the February 2006 appraisal, asserting that it is hearsay. However, the appraisal was discussed in Ponsler's deposition; Ponsler acknowledged being aware of an appraisal of less than $850,000 prior to closing on the unit even though he did not recall having previously seen the $812,00 appraisal when it was shown to him during his deposition. (Ponsler Dep. at 36).

them; as some players got out of the game after their units had increased in price before closing, others willingly entered the market to take their place—later selling their interests after prices had climbed even higher. <u>See generally</u> Tom Bayles, <u>Florida Condo Associations Get Power in Dealing with Foreclosures</u>, Sarasota Herald-Tribune, June 2, 2010, at D1 ("During the housing boom there was no hotter commodity [than a condominium unit]. At the height of frenzied buying, people stood in long lines just for a chance to put a deposit down and secure a unit. Often the unit was immediately resold, or flipped, several times for a profit."); Andrew Dawid, <u>The American Economy and Condo Pricing</u>, http://www.vipcondotoronto.com/american-economy-and-condo-pricing.php (last visited June 25, 2010) (discussing the American real estate market collapse and noting that "[i]n some new [condominium] projects, units were flipped many times prior to closing").

Plaintiffs merely speculate that Bilello's prior contract for the unit affected the value of their unit and deprived them of their flipping opportunity. They have presented no basis for concluding that anything other than market forces or their own error as to price is to blame for their inability to resell and profit. <u>Cf.</u> <u>Stein v. Paradigm Mirasol, LLC</u>, 586 F.3d 849, 851 (11th Cir. 2009) ("There was a sharp upward swing in housing prices between late 2000 and the end of 2005, and the resulting bubble was bigger in Florida than in most other states. . . . The bigger the bubble, the bigger the pop. The bigger the pop, the bigger the losses. And the bigger the losses, the more likely litigation will ensue. Hence this case."). If the market had continued to climb—or if Plaintiffs had gotten in on the game sooner—Plaintiffs likely could have resold this unit for a profit. Plaintiffs have presented absolutely no evidence that the existence of a prior contract on the property is the reason they were unable to do so.

Indeed, Plaintiffs' own experience belies this assertion.  Shortly after they purchased the Blue Heron unit, they also purchased a condominium unit in St. Petersburg, Florida with the intention of flipping it.  They purchased that unit during preconstruction also, and they do not assert that any fraud or deceit or third-party involvement (à la Bilello) in that unit.  Yet, they have been unable to resell the St. Petersburg unit either, and its value today is much less than what they paid.  Yet, when asked why they have not been able to resell it, Kalil responded, "you know the Florida market."  (Kalil Dep. at 7, 94; see also Ponsler Dep. at 33-34).

As emphasized in Billian, the issue is the effect, if any, on value—not the existence of a prior contract or a proceeds-assignment agreement between the developer and a third party such as Bilello.  Plaintiffs did no market research other than asking Kalil's family friend if Lezotte's quoted price and resale estimate sounded reasonable, and they have not presented any evidence that the existence of Bilello's contract had any effect on the value of the condominium.  Their bare statements that they would not have contracted for the property "had they known the truth" is not sufficient to render that fact material.  If the law were otherwise, every buyer could get out of any contract just by declaring that some factor totally irrelevant to value was subjectively material to him or her.  See Billian, 710 So. 2d at 987 (rejecting plaintiffs' subjective approach to materiality, which would have "measur[ed] how disclosure would have affected their personal decision to purchase" and emphasizing

that the test is whether the undisclosed fact "materially affect[s] the value of the property").[9]

     b.    *"[T]hat Premier Real Estate was acting as the agent for both Blue Heron LLC and Bilello in the marketing and sale of the Unit and in the Transaction."*

Plaintiffs contend that Premier, through Lezotte, was acting as the agent of both Blue Heron and Bilello in selling the unit to Plaintiffs and that had they known this, they would not have entered into the SPA. Blue Heron denies that Lezotte was acting on its behalf in making statements to Plaintiffs and asserts that Bilello engaged Premier to market the unit and thereafter, Blue Heron merely agreed to allow Bilello to cancel his agreement.

Assuming arguendo that Lezotte was acting for both Bilello and Blue Heron in marketing the unit to Plaintiffs, the Court finds that the materiality of this omission is inextricably intertwined with the materiality of the existence of Bilello's contract to purchase the unit. As discussed above, the fact that Bilello had contracted to buy the unit was not material to the sale because it has not been shown to have affected the value of the unit. Even if Plaintiffs thought that Lezotte was acting solely on Blue Heron's behalf in selling the unit, Plaintiffs did ultimately purchase the unit from Blue Heron.

     c.    *"That the Transaction was not truly a direct sale by Blue Heron LLC to Plaintiffs at a preconstruction price."*

---

[9]Plaintiffs also attempt to seize on the "or loss to the purchaser" language of <u>Casey</u>. Their arguments regarding materiality, however, are circular. They assert that they have established pecuniary loss because they "paid more for the Unit than they would have if they were informed of Bilello's interest" and that "whether Bilello's contract affected the Unit's value would depend, essentially, on whether that fact was 'relevant.'" (Doc. 79 at 8, 9). Plaintiffs may not, however, establish materiality by their own self-serving statements, and recasting "materiality" as "relevance" does not advance the debate. As discussed in the text, Plaintiffs have not shown that the value of the unit was affected by Bilello's contract or that their inability to resell the unit was due to anything other than market forces.

Plaintiffs also assert that Defendants failed to disclose that the sale was "not truly a direct sale by Blue Heron LLC . . at a preconstruction price." This asserted omission is merely a recasting of the alleged affirmative misrepresentations regarding "preconstruction pricing" and "direct sale from the developer," the alleged falsity of which have already been addressed in the discussion of Count II. As noted earlier, Plaintiffs have not established that the transaction was not in fact a "direct sale by Blue Heron" or that it was not a "preconstruction price." Plaintiffs assert that this purchase was not "direct," but it could not have been anything but "direct" because only Blue Heron had title to convey—Bilello never had anything to transfer to Plaintiffs except his own contract, and he did not assign that contract to them, instead cancelling it and then being the recipient of the difference in the sale amounts.

       *d.*     *The fact "that Schinz and Blue Heron LLC had agreed to allow Bilello to terminate his purchase contract so the Unit could be sold to Plaintiffs."*

Plaintiffs have not established that this fact is material. This statement is intertwined with the issue of the materiality of the existence *vel non* of Bilello's SPA. A developer or seller of real estate might enter into several contracts to sell a property before actually consummating a sale. Real estate contracts are cancelled—or fall through—all the time, for myriad reasons. If Bilello had simply wanted to cancel his contract and walk away and Blue Heron had allowed that and sold the unit to Plaintiffs, the transaction would have been no different from Plaintiffs' perspective. The fact that Blue Heron allowed Bilello to cancel his contract and to reap the benefit of the unit being sold to Plaintiffs at a higher price makes no difference; it is the price difference—not the existence of Bilello's SPA in the first

instance—that is driving this case, and as earlier discussed, Plaintiffs have not shown how value was affected. Where the proceeds of the sale ultimately go does not affect the value of the unit or whether these Plaintiffs paid the price they were willing to pay.

*e. Conclusion as to Fraudulent Concealment*

In sum, none of the omissions asserted as material has been shown to have been material to Plaintiffs' purchase. Each of these omissions derives from the existence of Bilello's SPA, and the fact that Blue Heron and Bilello had entered into that SPA has not been shown to have affected the value of the unit. Count III thus fails as a matter of law.

### 3. ILSFDA (Count I)

In addition to their state law fraud claims, Plaintiffs also bring a claim under the ILSFDA. Defendants assert that the transaction at issue is exempt from the provisions of the ILSFDA and that even if it is not exempt, no violation of the ILSFDA occurred here.

*a. Applicability of ILSFDA*

Defendants contend that the ILSFDA does not apply to the sale of the unit to Plaintiffs, relying on an exemption to the application of ILSFDA for "the sale or lease of any improved land on which there is a residential, commercial, condominium, or industrial building, or the sale or lease of land under a contract obligating the seller or lessor to erect such a building thereon within a period of two years." 15 U.S.C. § 1702(a)(2). Defendants assert that Blue Heron obligated itself to erect the condominium building within two years of the signing of the SPA.

As Defendants acknowledge, the Court has twice addressed this issue in this case. Defendants raised this argument in motions to dismiss and the Court rejected it, determining

that Blue Heron had not truly obligated itself to complete the building within two years because two conditions placed on the efficacy of the SPA—the "presale contingency" and the "development permit contingency"—were within Blue Heron's control and rendered the two-year obligation illusory. (See Orders, Docs. 43 & 66). In the instant summary judgment motion, Defendants once again urge that the § 1702(a)(2) exemption applies, asserting that although the Court was confined to the pleadings in analyzing this issue at the motion-to-dismiss stage, the Court may now consider the factual record. Defendants contend that "[t]he undisputed evidence shows that at the time [the SPA was signed], all required permits were already obtained for Tower I, Blue Heron had satisfied the construction lender's presale requirements, and a construction loan was already obtained." (Doc. 69 at 11). Thus, Defendants assert, the presale and permit contingencies "were no longer contingencies at the time the [SPA] was signed." (Id.).

Plaintiffs respond that while Defendants have asserted that it is undisputed that all permits had been obtained and all presale requirements had been satisfied, Defendants have not cited any evidence that this in fact had occurred. Plaintiffs are correct in this regard. All parties have agreed that the building was under construction at the time of the SPA was signed, but the Court cannot determine on the record before it that this circumstance necessarily shows that the permitting and presale requirements were no longer contingencies. Plaintiffs note that Defendant Schinz testified in his deposition that lenders changed presale requirements at their whim, and even though a presale contingency could be met at one point in time, that state of affairs could change via a change in the lender's requirements or due to cancellation of sales contracts. (Schinz Dep., Ex. 6 to Doc. 78, at

122-29).  Thus, once again, Defendants have not established that this transaction was exempt from ILSFDA, and the Court will proceed to the merits of Plaintiffs' ILSFDA claim.

 b. *Plaintiffs' ILSFDA Claim*

The ILSFDA "is a consumer protection statute 'that was intended to curb abuses accompanying interstate land sales.'"  Stein, 586 F.3d at 853 (quoting Winter v. Hollingsworth Props., Inc., 777 F.2d 1444, 1448 (11th Cir. 1985)).  While cases under the ILSFDA often involve alleged noncompliance by developers with a statutory property report requirement, in this case Plaintiffs allege that Defendants violated a different aspect of the statute.  Plaintiffs assert violation of 15 U.S.C. § 1703(a)(2), which provides in pertinent part:

> It shall be unlawful for any developer or agent, directly or indirectly, . . . with respect to the sale or lease, or offer to sell or lease, any lot not exempt under section 1702(a) of this title—
>
>  . . . .
>
>  (B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot of subdivision; [or]
>  (C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser . . . .

Tracking the language of paragraph (B) of this section, Plaintiffs contend that Blue Heron, Premier, and Bilello "made untrue statements of material fact by which they obtained money from Plaintiffs" when they "represent[ed] through Lezotte's statements that the [purchase of the unit] was a direct purchase by Plaintiffs from the developer Blue Heron LLC at

preconstruction pricing" and by misrepresenting in the SPA that the transaction was a "direct purchase" from Blue Heron. (Am. Compl. ¶¶ 32, 34). Additionally, Plaintiffs allege that Defendants knew that the purchase "was not truly a direct purchase from Blue Heron LLC at preconstruction pricing," knew that Bilello had a contract to buy the unit, and knew that Blue Heron had agreed to allow him to terminate that contract so that the unit could be instead sold to Plaintiffs, yet Defendants did not disclose these facts. (Id. ¶ 35). Plaintiffs also allege in this count—tracking the language of paragraph (C) of § 1703(a)(2)—that "by engaging in the misrepresentations and omissions described above, each of Defendants has engaged in a transaction, practice, and/or course of business that has operated, or would operate, as a fraud or deceit upon Plaintiffs." (Id. ¶ 36).

The allegations in this count are essentially the same as the allegations of Count II to the extent that material misrepresentations are alleged and as the allegations of Count III to the extent that material omissions are alleged. As discussed earlier, Plaintiffs have not presented any evidence showing falsity of any representation or materiality of any omission. Thus, to the extent that Count I is based on paragraph (B) of subsection 1703(a)(2), it fails for the same reasons as do Counts II and III.

Paragraph (C) of subsection 1703(a)(2) proscribes "engage[ment] in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser." Plaintiffs rely on the same misrepresentations and omissions earlier described as amounting to the requisite "transaction, practice, and/or course of business." (See Am. Compl. ¶ 36). Because the omissions and misrepresentations are already expressly covered in subparagraph (B), the Court construes Plaintiff's subparagraph (C) claim as based on the

"behind-the-scenes" activities of Blue Heron and Premier with regard to routinely allowing contracting parties out of their contracts, selling units to new purchasers, and allowing the initial contracting parties to reap the benefits of the higher price agreed to by later purchasers.

The Court has considered Blue Heron's and Premier's practice as revealed by the record and circumstances of this case. Just as Plaintiffs have failed to establish a false statement or material omission, they have also failed to establish an actionable fraud or deceit through the practices described above. As noted throughout this Order, Plaintiffs contracted for and received a condominium unit directly from the developer, and they have not presented evidence of how a prior contract on that unit materially affected the value of the property. While the existence of two contracts on the same unit certainly could have been a problem for Blue Heron if both buyers wished to close on that unit, that circumstance did not occur. Instead, Blue Heron willingly allowed Bilello to cancel his contract and agreed to allow him to retain the price difference. Bilello is mentioned on the HUD-1 statement—presumably for accounting reasons of some kind—but seemingly he need not have been mentioned at all. Blue Heron could have done what it wanted to do with the sales proceeds; it obligated itself to give the proceeds to Bilello prior to the closing, and it did so and reflected that on the HUD-1 statement. But, despite Plaintiffs' repeated characterizations, Bilello never bought the unit or had title to the unit, and only Blue Heron conveyed the unit to Plaintiffs, just as the SPA indicated. The Court cannot find any fraud or deceit in any practice or course of business any more than it has found it via

misrepresentations or omissions.  Count I fails *in toto.*[10]

## 4.  Other Issues

Several other issues raised in Defendants' summary judgment motion require brief mention.

### a.  *Schinz's Personal Liability*

Schinz asserts that even if Blue Heron is found liable in this case, he cannot be held personally liable for acts he performed on Blue Heron's behalf.  He notes that he did not interact with Plaintiffs or make representations to them; he merely signed contracts on Blue Heron's behalf.  Because the Court has found that Plaintiffs' claims fail, the issue of whether there is a basis for Schinz's individual liability need not be addressed.

### b. *Proper Parties*

Defendants assert in their motion that Plaintiffs are not proper parties to pursue their claims in the first instance and also that Plaintiffs' wives—whose names are on the deed to the unit—are necessary parties to this case.  Neither of these contentions has merit.

Defendants' first assertion is based on the fact that the initial SPA executed on September 2, 2005 was signed by Plaintiffs not as individuals but as general partners of Green Bananas, LLC ("Green Bananas"), a limited liability company through which Plaintiffs

---

[10]The Court has not overlooked Pigott v. Sanibel Development, LLC, in which a federal district court in Alabama allowed an ILSFDA claim based on similar facts to proceed past summary judgment, stating that "the material omission theory advanced by [the plaintiffs] is actionable under the ILSFDA, and it is for the finder of fact to decide whether [the] plaintiffs were in fact defrauded in this manner."  576 F. Supp. 2d 1258, 1279-80 (S.D. Ala. 2008).  However, the record evidence in the instant case does not support Plaintiffs' claim that they suffered an actionable deceit.  In any event, the Pigott decision is not binding on this Court.

intended to purchase the condominium. Defendants assert that the fraud causes of action asserted in this case belong to Green Bananas and not to Plaintiffs individually because fraud claims cannot be assigned.

However, Plaintiffs executed a second SPA in their individual capacities after they were unable to obtain financing in the name of Green Bananas. (Ex. 7 to Doc. 78).[11] There is no evidence that the original, Green Bananas SPA was assigned, though the record does reflect that the *down payment* made by Green Bananas was assigned and applied to Plaintiff's second, individual-capacity SPA. The existence of the prior Green Bananas SPA does not render Plaintiffs improper parties to pursue fraud claims.

Second, Defendants assert that because Plaintiffs seek the remedy of rescission of the condominium sale, their wives—whose names are also on the deed—are necessary parties to this case. Plaintiffs respond that Kalil's wife no longer has an interest in the unit by virtue of a divorce decree and that Ponsler's wife has given him authority to act on her behalf with respect to the unit. Although the Court does not find Plaintiffs' submitted evidence on these points to be sufficient to establish that Plaintiffs' wives need not be joined, the Court has not ordered rescission of the transaction; indeed, no relief at all is being awarded to Plaintiffs. Because title to the property is not being affected, the co-owners of the unit need not be made parties prior to disposition of this case.

### III.  Conclusion

---

[11]The parties apparently agree that the date on the second SPA—the one signed by Plaintiffs in their individual capacities—is not accurate. That document was signed not on September 2, 2005 as indicated but sometime in February 2006. The backdating of the agreement makes no difference in the analysis, however.

Plaintiffs understandably are disappointed that they were unable to flip their Blue Heron condominium at a quick profit before closing. However, their assertions that this inability was due to the fact that Bilello had previously contracted for the same condominium ring hollow. Plaintiffs were left standing when the music stopped, but they have presented no evidence that Defendants are to blame for their lack of a chair.

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. The Motion for Summary Judgment (Doc. 69) filed by Defendants Blue Heron and Schinz is **GRANTED** as to all three counts of the Amended Complaint (Doc. 47).

2. Plaintiffs shall show cause **on or before Thursday, July 1, 2010**, why judgment should not also be entered in favor of Defendant Bilello based on the Court's rulings in this Order.[12]

**DONE** and **ORDERED** in Orlando, Florida this 28th day of June, 2010.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party

_____

[12]This is not an invitation for Plaintiffs to reargue the merits of the summary judgment motion. The allegations of the Amended Complaint indicate that Plaintiffs' claims against Bilello are based on the events already discussed in this Order, and Plaintiffs are simply being given an opportunity to set forth a reason—if one exists—that the claims against Bilello could possibly survive the rulings herein.